UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re:

                                                 Case No. 08-71973-478

PETER BOUDOUVAS
AND ANTOINETTA BOUDOUVAS,

                                                 Chapter 7

                Debtors.
--------------------------------------------------------x
ANDREW M. THALER, TRUSTEE of the
ESTATE of PETER BOUDOUVAS and
ANTOINETTA BOUDOUVAS,

                Plaintiff,

     - against -

                                                 Adv. Pro. No. 08-8149-478

NEW MILLENNIUM PAWNBROKERS, INC.
AND MODELL CASH LOANS, LLC,

                Defendants.
--------------------------------------------------------x

# MEMORANDUM DECISION

Appearances:

Thaler & Gertler
*Attorneys for the Plaintiff*
By: Lidia Szczepanowski, Esq.
90 Merrick Avenue
Suite 414
East Meadow, NY 11554


Law Offices of Mitchell J. Devack, PLLC
*Attorneys for the Defendants*
By: Mitchell J. Devack, Esq.
90 Merrick Avenue
Suite 500
East Meadow, NY 11554


The Honorable Dorothy T. Eisenberg, United States Bankruptcy Judge

Before the Court is the Plaintiff's motion for summary judgment and the Defendants' cross motion for summary judgment.  At issue is whether certain collateral pledged by the Debtor, Peter Boudouvas, to secure a loan given to him by New Millennium Pawnbrokers, Inc. ("New Millennium") constitute property of the bankruptcy estate and whether the interest on such loan is usurious therefore void under state law.  This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334.  This contested matter is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (E), (K) and (O) and 11 U.S.C. §§ 541, 542 and Rule 7001(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The following constitutes the Court's finding of fact and conclusions of law as mandated by Bankruptcy Rule 7052.

FACTS

The Debtors, Peter and Antoinetta Boudouvas filed for chapter 7 relief on April 19, 2008.  Prior to the bankruptcy filing, the Debtor entered into a collateral loan agreement ("Collateral Loan Agreement") with New Millennium on 6/29/07 under which New Millennium lent the Debtor $12,000.  The loan was due 10/28/07 and contained the following terms on the pawn ticket:

| | |
|---|---|
| Insured Value of Items | $24,000.00 |
| Insurance Fee | $    360.00 |
| Service Fee As Agreed | $    360.00 |
| Ticket Charge | $      5.00 |
| Cost to Replace Ticket if Lost | $    10.00 |
| Amount Financed | $12,000.00 |
| Finance Charge | $ 2,645.00 |
| Total of Payments | $14,645.00 |
| Annual Percentage Rate | 66.12% |

In exchange for the loan, the Debtor gave New Millennium a security interest in 1 Gold Presidential Rolex watch with Diamond Bezel and 1 Rolex Submariner watch (the "Collateral"

1

or "Watches").  At his deposition, the Debtor testified that he did not have any discussion with anyone at New Millennium regarding the terms of the Collateral Loan Agreement other than information regarding the principal of the loan, when the loan was due, and the cost of the loan. The Debtor did not have any discussion with anyone at New Millennium regarding the "service fee" of $360 listed on the Collateral Loan Agreement.  The Debtor assumed that the Watches would be kept in a safe at the back of the store and that the store had bullet-proof glass in the front.  The Debtor testified that no one informed him that his Watches might be kept in a bank vault off premises and that he would need to call in advance if he wanted to redeem the Watches. The Defendants were unable to provide evidence to refute the Debtor's testimony. Under the terms of the Collateral Loan Agreement, if the Debtor failed to redeem the Collateral, New Millennium could sell the Collateral after 4 months from the date of the Collateral Loan Agreement.

       Kishin Banani, a representative of New Millennium, testified that as a general practice and in the ordinary course of business, New Millennium accepted only gold jewelry; 18, 14, and 22 carat gold; diamonds and watches as security for a loan.  All jewelry was placed in a bank vault as New Millennium did not keep jewelry in the store. With respect to Collateral, when the Collateral was in the possession of New Millennium, the Collateral was stored at New Millennium's vault at HSBC Bank in Woodside in Queens County, New York.   According to Mr. Banani, "extra care" meant that the watches are bubble taped first, wrapped and placed in a cardboard container and the watches go into a bank locker.  Jewelry was not kept at the store. In transferring any collateral to the bank for storage, New Millennium required two people to transport the collateral. There is no evidence that any one at New Millennium told the Debtor

2

that this constituted "extra service" for which he was charged the $360 service fee. With respect to the insurance fee, Mr. Banani testified that there is no specific insurance policy taken for the specific Collateral but rather New Millennium had a "whole store liability insurance." Accordingly, New Millennium did not purchase special or separate insurance to cover only the Watches.

The Debtor did not repay the loan at the end of the 4 month period.  Nonetheless, the Debtor testified that he would periodically stop by New Millennium's store to inquire about the status of his Collateral and to express his intention to repay the loan.

In February 2008, New Millennium sold its rights under the Collateral Loan Agreement to Modell Cash Loans, LLC ("Modell") and went out of business.  New Millennium was and Model is located in Queens County in the City of New York.  A representative of Modell asserts that the Collateral was placed in vault storage where they remain today.  There is no indication as to whether vault storage is at the premises of Modell or at an off-site premises like a bank. After the assignment of the Collateral Loan Agreement, the Debtor approached Modell to inquire about the status of his Collateral and how much he would need to pay under the Collateral Loan Agreement in order to redeem the Collateral.  When the Debtor was told that he would need to pay $20,000 in order to satisfy the $12,000 loan he received under the Collateral Loan Agreement, the Debtor decided not to redeem the Collateral.  As a result, the Collateral currently remains in possession of Modell.

Andrew M. Thaler, Esq. the Chapter 7 Trustee, commenced this adversary proceeding against New Millennium Pawnbrokers, Inc. ("New Millennium") and Modell on July 9, 2008. Both Defendants are "Collateral Loan Brokers" as defined under N.Y. General Business law §

52. The Trustee seeks summary judgment on his 1) first cause of action declaring the Collateral Loan Agreement was void as usurious under N.Y. General Obligations Law § 5-511; 2) second cause of action voiding the Collateral Loan Agreement as usurious under N.Y. General Obligations Law § 5-511; and 3) third cause of action directing the Defendants to turnover the Collateral to the trustee as property of the estate pursuant to 11 U.S.C. §§ 541 and 542.  The Trustee argues that the Collateral Loan Agreement is usurious because the monthly interest rate charged by the Defendants exceeds 4% per month because certain of the fees included in the finance charge exceeded the amount permitted under New York law and such fees were not requested by the Debtor.  As a result, the Annual Percentage Rate of 66.2% translates into a monthly interest rate which exceeds the 4% per month permitted.

The Defendants in their cross motion for summary judgment argue that the Collateral is not property of the bankruptcy estate pursuant to 11 U.S.C. § 541(b)(8) on the basis that 1) they are licensed to make loans secured by pledges of tangible personal property; 2) the Collateral is in Modell's possession, 3) the debtor has no obligation to repay the money, redeem the Collateral, or buy back the property at a stipulated price; and 4) the Debtor nor the Trustee has exercised any right to redeem in a timely manner.  In their opposition to the Trustee's motion for summary judgment, the Defendants argue that even if the Collateral is deemed to be property of the bankruptcy estate, the loan was not usurious.

The Trustee in his affirmation in support of his motion for summary judgment and in opposition to the Defendants' cross motion argues that if the Court finds the Collateral Loan Agreement to be usurious under N.Y. General Obligations Law § 5-511 and void under New York law, then no valid pledge of personal property was made as contemplated by 11 U.S.C. §

4

541(b)(8) and the Defendants' cross motion must be denied. In order for there to be "pledged property" under Section 541(b)(8), there must first be a valid, enforceable and non-usurious loan agreement that creates the pledge.

DISCUSSION

I.    General.

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure as made applicable by Bankruptcy Rule 7056, the Court may award summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

When no genuine triable issues of material fact exist, the moving party is entitled to judgment as a matter of law and summary judgment should be granted. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11-12 (2d Cir. 1986). The mere production of some evidence in support of the opposing party's position will not justify denial of a summary judgment motion, unless the court finds that there is evidence upon which a jury can properly proceed to find a verdict for the party opposing the motion. *American v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Instead, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." *Williams v. Smith*, 781 F.2d 318, 323 (2d Cir. 1986). A court must always "resolve ambiguities and draw reasonable inferences against the moving party." *King v. United States Fire Ins. Co.*, 804 F.2d at 11. However, the opposing party may not rely upon "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Id.,* 804 F.2d at 12.

5

II.     11 U.S.C. § 541(b)(8).

With respect to whether the Collateral is property of the bankruptcy estate, Section

541(b)(8) of the Bankruptcy Code provides as follows:

> (b) Property of the estate does not include --
>> (8) **subject to subchapter III of chapter 5**, any interest of the debtor in property where the debtor pledged or sold tangible personal property (other than securities or written or printed evidences of indebtedness or title) as collateral for a loan or advance of money given by a person licensed under law to make such loans or advances, where –
>>> (A) the tangible personal property is in possession of the pledgee or transferee;
>>> (B) the debtor has no obligation to repay the money, redeem the collateral, or buy back the property at a stipulated price; and
>>> (C) neither the debtor nor the trustee have exercised any right to redeem provided under the contract or State law, in a timely manner as provided under State law and section 108(b); ....

Accordingly, 11 U.S.C. § 541(b)(8) declares that certain tangible personal property pledged to

collateral loan brokers or pawn brokers is excluded from property of the estate. Regardless of

whether the paragraphs (A), (B), and (C) of Section 541(b)(8) is satisfied in this case, '[b]y its

terms section 541(b)(8) is "subject to subchapter III of chapter 5" of the Bankruptcy Code. This

encompasses sections 541 to 562 and, among other things, exposes the pledges and sales to

attack under various avoiding powers of the Bankruptcy Code.' 5 COLLIER ON

BANKRUPTCY, P 541.22D at 541-106 (15th ed. rev. 2008). In this adversary proceeding, the

Trustee is seeking to avoid the Collateral Loan Arrangement on the grounds that it is usurious.

Accordingly, the arrangement may be subject to such an attack. To the extent such arrangement

can be voided, then the collateral does constitute property of the bankrupt estate as there would

not be a valid pledge of personal property. As an inquiry must be made as to whether the interest

6

charge under the Collateral Loan Agreement is usurious, the Court addresses the Trustee's

motion for summary judgment first.


III.     Trustee's First Cause of Action.

       With respect to whether the Collateral Loan Agreement is void under New York law,

N.Y. General Obligations Law § 5-511 titled "Usurious contracts void" states as follows:


       1. <u>All bonds, bills, notes, assurances, conveyances, all other contracts</u> or securities
       whatsoever, except bottomry and respondentia bonds and contracts, and all
       deposits of goods or other things whatsoever, whereupon or <u>whereby there shall
       be reserved or taken, or secured or agreed to be reserved or taken, any greater
       sum, or greater value, for the loan or forbearance of any money, goods or other
       things in action, than is prescribed in section 5-501, shall be void</u>, except that the
       knowingly taking, receiving, reserving or charging such a greater sum or greater
       value by a savings bank, a savings and loan association or a federal savings and
       loan association shall only be held and adjudged a forfeiture of the entire interest
       which the loan or obligation carries with it or which has been agreed to be paid
       thereon.  If a greater sum or greater value has been paid, the person paying the
       same or his legal representative may recover from the savings bank, the savings
       and loan association or the federal savings and loan association twice the entire
       amount of the interest thus paid.

       2. Except as provided in subdivision one, whenever it shall satisfactorily appear
       by the admissions of the defendant, or by proof, that any bond, bill, note,
       assurance, pledge, conveyance, contract, security or any evidence of debt, has
       been taken or received in violation of the foregoing provisions, the court shall
       declare the same to be void, and enjoin any prosecution thereon, and order the
       same to be surrendered and cancelled." (Emphasis added).


       New York General Obligations Law § 5-501 titled " Rate of Interest, usury forbidden"

states "[t]he rate of interest, as computed pursuant to this title, upon the loan or forbearance of

any moneys, goods, or things in action, except as provided in subdivisions five and six of this

section <u>or as otherwise provided by law,</u> shall be six per centum per annum unless a different

rate is prescribed in section fourteen-a of the banking law." (Emphasis added).

Defendants are collateral loan brokers as referred to in Art. 5 of N.Y. General Business Law, the entire Article 5 of N.Y. General Business Law applies. Under N.Y. General Business Law § 46:

> <u>Notwithstanding any general or special statutes, local laws and ordinances to the contrary, no collateral loan broker shall ask, demand or receive any greater rate of interest than four per centum per month</u>, or any fraction of a month, and a notice containing a list of such rates of interest as herein provided and in accordance with the act of congress entitled "Truth in Lending Act" and the regulations thereunder, as such act and regulations may from time to time be amended shall be conspicuously displayed within the premises of such collateral loan broker. A minimum interest charge of twenty-five cents per month may be made on any loan.
>
> No collateral loan broker shall receive or be entitled to any interest or charges as provided by this article on any loan for any period of time exceeding fifteen months from the date of the making of such loan, provided however that where a loan is extended at the direct request of the pledgor, the collateral loan broker may receive and be entitled to any interest or charges provided by this article on such loan for any period of time not to exceed fifteen months from the date of such extension. (Emphasis added).

Section 44 of N.Y. General Business Law which addresses, inter alia, "services charges: that can be charged by collateral loan brokers states in relevant part:

> 1. Every such collateral loan broker shall at the time of each loan deliver to the person pawning or pledging any goods, article or thing, a memorandum or note signed by him containing the substance of the entry required to be made in his book by the past preceding section. Notwithstanding any general or special statues, local laws and ordinances to the contrary, no collateral broker shall ask demand or receive a service charge greater than ten dollars for loans equal to or greater than five hundred dollars, or seven dollars for loans equal to or greater than one hundred dollars but less than five hundred dollars for any such memorandum or note, provided that for loans less than one hundred dollars a service charge not greater than four dollars may be imposed...
>
> Should such ticket be lost or mislaid the pawnor shall at once apply to the collateral loan broker, in which case it shall be the duty of the collateral loan

broker to permit such person to examine his books, and on finding the entry for said ticket, note or memorandum so lost and upon his giving to the collateral loan broker an exact description of the article pawned the collateral loan broker shall issue a second or stop ticket for the same, provided such person shall furnish to the collateral loan broker a lost instrument bond in an amount equal to the fair market value of the pledge or, in the alternative, pay a lost ticket charge of one percent of the amount of the loan, or five dollars, whichever is greater.

Title 2 of the N.Y. Code of Rules and Regulations ("N.Y.C.R.R.") § 15.8 also authorizes collateral loan brokers to charge borrowers other service fees and charges, in addition to the maximum allowable interest set forth in N.Y. General Business Law § 46.

(a) Lawful extra charges shall mean those charges allowed by the mayor of a city or local licensing authority, which may be by rule or regulation promulgated for extra care services rendered by a collateral loan broker.  It is the duty of the collateral loan broker to perform those services and to take such care of pledged articles as is normally required of a pledged article of personal property; where, however, the collateral loan broker <u>actually gives or renders extra care and assumes a risk beyond those normally rendered and assumed by a collateral loan broker</u>, and a charge is made for such extra care, <u>the collateral loan broker shall specifically call the pledgor's attention to the said charge at the time the loan is made</u>, and no such charge or fee shall be allowed unless the pledgor shall sign an agreement, to pay such extra charge and the fee for such extra charge, as agreed upon shall be inserted on the face of the pawn ticket. (Emphasis added).

The purpose of statutes prohibiting usurious loans is "to protect desperately poor people from the consequences of their own desperation." *Seidel v. 18 East 17th St. Owners, Inc.*, 79 N.Y.2d 735 (1992), citing *Schneider v. Phelps*, 41 N.Y.2d 238, 243 (1977).  "The consequences to the lender of a usurious transaction can be harsh:  the borrower is relieved of all further payment -- not only interest but also outstanding principal, and any mortgages securing payment are cancelled.  In effect, the borrower can simply keep the borrowed funds and walk away from the agreement.  Moreover, the borrower can recover any interest payments made in excess of the legal rate (General Obligations Law § 5-513).  New York usury laws historically have been severe in comparison to the majority of states (1960 Report of NY Law Revision Commission,

9

1960 Legis Doc. No. 65, at 77), reflecting the view of our Legislature that the prescribed

consequences are necessary to deter the evils of usury." *Seidel*, 79 N.Y.2d at 740.

Under the Collateral Loan Agreement, the "Finance Charge" of $2,645 is broken down as

follows:

| | |
|---|---|
| Interest on $12,000 loan at rate of 4% per month = | $  480 |
| Term of loan is 4 months | x   4 |
| Total interest for 4 months is | $1,920 |
| + Insurance fee | $  360 |
| + Service Fee | $  360 |
| + Ticket Charge | $     5 |
| Total Finance Charge | $2,645 |

The Trustee initially argues that the $5 "Ticket Charge" represented the lost ticket fee

that should not have been included in the finance charge and the Defendants deny that the $10

lost ticket fee was ever charged.  On the face of the Collateral Loan Agreement, a $10 lost ticket

fee is itemized separately from the "Service Fee" and "Ticket Charge".  Although $5 is the

maximum that could be charged under N.Y. General Business Law § 44(1) for a lost ticket and

not $10, the fee is contingent and it does not appear that Defendants included the $10 lost ticket

fee in the finance charge.  As, the Court must always resolve ambiguities and draw reasonable

inferences against the moving party,  *King v. United States Fire Ins. Co.*, 804 F.2d at 11, the

Court will not deem the $5 charge to be a lost ticket fee.  Defendants have explained that the $5

actually represents a service charge pursuant to § 44(1).  As discussed above, a collateral loan

broker, however, is entitled under N.Y. General Business Law § 44(1) to charge a $10 service

fee for loans equal to or greater than $500.  Under the circumstances, a service charge of $5

would be proper under N.Y. General Business Law § 44(1).

The Trustee next argues that because the loan is for $12,000, New Millennium could only

10

impose a service charge of $10 under section 44(1) of N.Y. General Business Law.  Therefore, the Trustee asserts that the service fee of $360 charged by New Millennium exceeded the statutorily authorized maximum sum by $350.  Even if the $360 represented a fee for extra care services under section 5-221 of 6 R.C.N.Y. as alleged by New Millennium, the Trustee argue that "extra care" fees authorized by 6 R.C.N.Y. § 5-221 for valuable items range from $25 for "fur coats, fragile, delicate or bulky items" and "art objects including paintings and sculptures" to $5 for "cameras and photographic equipment" and "musical instruments".  Accordingly, the extra care fee of $360 for the Watches was unreasonable.  In addition, the Trustee argues that there is no evidence that the Debtor requested or agreed to the extra fees.  The Debtor did not sign his initials on the box next to the $360 "service fee" charge as set forth in the Collateral Loan Agreement.  The Debtor denies that any discussion took place as to the extra care fee and the Defendants have not provided any evidence refuting such testimony.

Section 44(1) of N.Y. General Business Law provides that the maximum service fee that could be charged for loans greater than $500 is $10, "notwithstanding any general or special statutes, local rules and ordinances to the contrary".  However, "[c]ollateral loan brokers...are regulated by local government units and subject to certain regulatory provisions of the General Business Law.  The provisions of the General Business Law regulating collateral loan brokers are applicable to cities which have not specifically been given power in their charters to regulate the collateral loan brokers business and to fix the rates charged by collateral loan brokers." 10 N.Y. Jur. 2d Banks § 966.  In the City of New York, the Department of Consumer Affairs has the authority to issue licenses for those seeking to be a pawnbroker.  6 R.C.N.Y. § 1-01.  The New York City Charter § 436 provides that the police commissioner shall possess powers of general

supervision and inspection over all licensed or unlicensed pawnbrokers.  Accordingly, where the

City of New York has issued explicit regulation regarding the certain fees charged by collateral

loan brokers, including fees for extra care, such regulation would be applicable in the first

instance to determine whether such fee was reasonable and permitted.

Section 5-221 of Title 6 of the Rules of the City of New York (Department of Consumer

Affairs) (the "R.C.N.Y.") provides as follows:

> No collateral loan broker shall charge or exact a fee ***other than that permitted by***
> ***§ 44 of the General Business Law, except that the collateral loan broker may***
> ***charge a reasonable*** fee for:
> (1) insuring the articles from injury, fire, theft, burglary, robbery and other
> contingencies; and
> (2) extra care actually given <u>when specifically requested by the customer</u> and only
> if such fee does not exceed the following amounts:
>> (i) Storage of furs, fur coats, fragile, delicate or bulky items: $25.00.
>> (ii) Storage of art objects, including paintings, sculptures and all works in any
>> other medium for sizes not to exceed 36 inches by 36 inches: $25.00 plus any
>> costs actually incurred for special caring and packaging; and for sizes exceeding
>> the foregoing: an amount separately agreed to by the parties.
>> (iii) Vault storage for a stamp or coin collection: $20.00.
>> (iv) <u>Vault storage for jewelry: 2 percent of the amount of the loan not to
>> exceed $20.00; if the loan exceeds $1,000: an amount separately agreed to
>> by the parties</u>.
>> (v) Transportation of pledged items to and from the vault either by courier(s) or
>> vehicles(s), together with security therefore: one percent of the amount loaned.
>> (vi) Special handling or wrapping of cameras and photographic equipment: $5.00.
>> (vii) Special handling of musical instruments: $5.00 for standard size; instruments
>> exceeding standard size: by separate agreement of the parties.
>> (viii) Special handling of radios, hi-fi's, VCRs, stereos and television equipment:
>> $10.00.
>> (ix) Special handling for other electrical apparatus, including computers: $10.00.
> (Emphasis added).

The Court notes that under 6 R.C.N.Y. § 5-221 vault storage for jewelry can be

considered extra care for which a collateral loan broker may charge a fee in excess of $20 that is

separately agreed upon by the parties. However, a fee for extra care services can be imposed

only if the broker actually gave or rendered extra care and assumed a risk beyond those normally rendered and assumed by a broker.  2 N.Y.C.C.R. § 15.8.  In addition, such fee must be reasonable.  6 R.C.N.Y. § 5-221. Section 15.8 of 2 N.Y.C.R.R. makes it clear that the extra charges "shall not be used as a substitute for or as a means of exacting additional charges from the pledgor in excess of the maximum interest rates provided for in section 46 of the General Business Law."

Although the Debtor signed the Collateral Loan Agreement with the "service fee" of $360 on the face of the agreement, the Court finds there is no evidence, however, that New Millennium explained that the service fee represented a fee for extra care or for vault storage. While Defendants argue that leaving collateral received for a loan in their store would constitute ordinary care in the industry, the Defendants never left collateral in the store as the only collateral they would accept are jewelry, gold, diamonds and watches and those were always placed in a vault.  The Defendants did this in the ordinary course of their business and not to provide extra care but because if any of the collateral was lost through its negligence, the Defendants would have been liable to the borrower for the insured value of the collateral. In addition, the Defendants never provided the Debtor with any written documentation of the actual vault fee, if any or any explanation as what the extra care was given with respect to the Collateral. The Debtor did not know that New Millennium routinely kept jewelry and watches given as collateral in a bank vault as he assumed that the Watches would be kept in a safe at the back of the store.  No one informed him that his Watches might be kept in a bank vault off premises and that he would need to call in advance if he wanted to redeem the Watches.  More importantly, there is no evidence that the Debtor specifically requested extra care of the Watches

13

or that they be placed in vault storage or how the Debtor and New Millennium arrived at $360 as the agreed upon charge for extra care as required under 6 R.C.N.Y. § 5-221.

In addition, the Court finds that the $360 extra care charge to be unreasonable in light of the de minimis amount that is allowed to be charged under 6 R.C.N.Y. § 5-221 for other valuable collateral, such as furs, art objects, and cameras. Even the extra care fee for vault storage for stamp or coin collection is $20. While the Defendants argue that one of the reasons for an extra charge for vault storage of the Collateral was necessary was that two persons were needed to transport the Collateral to the bank, the Court notes that Section 5-221(2)(v) provides that transportation of pledged items to and from the vault either by courier or vehicle together with security was limited to 1% of the amount loaned. In this case, the $360 fee charged represents 3% of the $12,000 loan given to the Debtor. In contrast to these minimal and reasonable fees set forth in Section 5-221, the $360 charged for what is represented as extra care is unreasonable and improper. The total finance charge should have been $2,285 and not $2,645 charged. The excess represents a usurious interest charge.

The Trustee also argues that New Millennium's Insurance Fee was unreasonable, arbitrary and unauthorized as New Millennium never took out an insurance policy to cover the specific Collateral nor did it assume any risk beyond those normally rendered by a pawn broker. Section 5-221 of 6 R.C.N.Y. permits a collateral loan broker to charge a reasonable fee for insurance items. However, Section 5-221 does not require that a collateral loan broker assume a risk beyond those normally rendered with respect to insurance. Rather, the requirement that a collateral loan broker assume a risk beyond those normally rendered applies only in the situation where the broker seeks to charge a fee for extra care as discussed above.

14

In determining whether the fee charged for insurance was reasonable, paragraph 7 of the Collateral Loan Agreement provides that: "[f]or purposes of determining any claims against [the Defendants], this pledge shall be deemed to have a value of not exceeding twice the amount of our loan stated on this ticket and in no event or suit shall [the Defendants] be liable on any claim in excess of that amount unless a higher value has been agreed upon between us and has been stated in writing upon this ticket signed by you." Paragraph 9 provides '[the Defendants] are not responsible for loss or damage by fire, water, riot, burglary, robbery, hold up or theft of any kind nor for any loss or damage caused by any other casualty, Act of God, or public enemy in excess of our insurance coverage which is set at twice the amount of the loan stated in accordance with the terms of paragraph "7" hereof.' The Collateral Loan Agreement provides that the insured value of the Collateral was determined at $24,000. Even though the Defendants did not specifically take out insurance on the Collateral, the Defendants would have been liable for this amount should any loss or injury resulted with respect to the Collateral when the Debtor tried to redeem the Collateral. Nevertheless, the Court has reservations about the appropriateness of the Insurance Fee given that the Defendants have already charged a fee for "extra care" and did not specifically provide any insurance with respect to the specific Collateral other than their own general insurance policy for their business operations. Moreover, the Defendants argued that if collateral was stored at the store and a burglar had stolen the collateral, a collateral loan broker would not be responsible for the loss. While the argument was made with respect to the standard of care that a collateral loan broker was responsible for, the Court questions whether the Debtor would have received the insured value of the Collateral if the Collateral was stolen under such a scenario even though he was charged an insurance fee of $360 and the Collateral Loan

Agreement provided for such an obligation on the part of the collateral loan broker in the event of such a loss.

However, as the "service fee" charged by the Defendants extra care represents a usurious interest charge that resulted in the interest being charged the Debtor exceeding the 4% per annum permitted under N.Y. General Obligations Law as discussed above, the Collateral Loan Agreement is usurious and void on that basis alone regardless of whether the Insurance Fee charge was appropriate.

IV.     Trustee's Second Cause of Action.

With respect to the Trustee's second cause of action, the Trustee seeks a declaratory judgment that the loan amount in the sum of $12,000 and all interest are not recoverable by virtue of the Collateral Loan Agreement being usurious.  As this Court finds that the Collateral Loan Agreement is usurious and void as a matter of law under N.Y. General Obligations Law § 5-511 and 11 U.S.C. § 544, the Defendants are not entitled to recover the loan amount of $12,000 or any interest accrued under the Collateral Loan Agreement.

V.      Trustee's Third Cause of Action.

With respect to the Trustee's third cause of action, the Trustee seeks an order directing the turnover of the Watches held by either New Millennium or Modell as they are property of the estate pursuant to 11 U.S.C. §§ 541 and 542 by virtue of the fact the Collateral Loan Agreement is usurious and void.  As the Defendants have no right, title or interest in the Collateral at issue under 11 U.S.C. § 541(b)(8).  The Defendants must turn over the Collateral to the Trustee

pursuant to 11 U.S.C. § 542.

Although the Trustee argues that the Court can refer the Defendants to the appropriate authorities if this Court determines that the Defendants willfully violated any provision of Article 5 of N.Y. General Business Law pursuant to N.Y. General Business Law § 54, the Court does not find any evidence of willfulness on the part of the Defendants.  Accordingly, the Court declines such request. While the Defendants argue that the charges for the level of care provided with respect to collateral it holds is common practice in the industry, to the extent this is so, then this industry would do well to correct such actions and refrain from adding unreasonable charges for holding and preserving the goods provided to them as collateral for a loan.


CONCLUSION

Based on the foregoing, the Court finds the Collateral Loan Agreement usurious and void.  Therefore, the Defendants' cross motion for summary judgment as to the Trustee is denied.  The Trustee's motion for summary judgment for the first, second and third causes of action is granted.


Dated: Central Islip, New York
      March 5, 2009                                            **_s/ Dorothy Eisenberg_**
                                                      Dorothy Eisenberg
                                                      United States Bankruptcy Judge